**United States District Court for the**

**District of New Hampshire**

U.S. DISTRICT COURT
DISTRICT OF NH
FILED

**2016 NOV 30  A 11: 26**

Civil Action No. 16-cv-

Roger Pitroff, 441 Jones Avenue, Portsmouth, NH 03801; Lee N. Roberts, 66 State Street, Portsmouth, NH 03801; Joanna N. Brode, 122 Mechanics Street, Portsmouth, NH 03801; Thaddeus J. Jankowski, Jr. 27 Franklin Street, Portsmouth, NH 03801; Ramona Charland, 285 Union Street, Portsmouth, NH 03801; Mark Brighton, 285 Union Street, Portsmouth, NH 03801; Esther Kennedy, 41 Pickering Street, Portsmouth,  NH 03801; Nancy Steele Elwell, 20 Islington Street, Portsmouth, NH 03801; Rebecca Lucy, 401 State Street, Unit P310, Portsmouth, NH 03801; Peter A. Whelan, 100 Gates Street, Portsmouth, NH 03801; Michael and Elizabeth Dater, 20 Pickering Street, Portsmouth, NH 03801; Peter B. Harris, 46 Manning Street, Portsmouth, NH 03801; Susan Paige Trace, 27 Hancock Street, Portsmouth, NH 03801; and, James A. Hewitt, 726 Middle Road, Portsmouth, NH 03801, plaintiffs.

v.

United States of America, c/o Emily Gray Rice, United States Attorney for the District of New Hampshire, 53 Pleasant Street, 4th Floor, Concord, NH 03301;

and

State of New Hampshire, c/o Maggie Hassan, Governor of the State of New Hampshire, State House, 107 North Main, #208, Concord, NH 03301;

and

The City of Portsmouth, c/o John P. Bohenko, City Manager, City of Portsmouth, New Hampshire, 1 Junkins Avenue, Portsmouth, NH 03801, defendants.

**Complaint**

Plaintiffs, for their Complaint, state that:

**Nature of Action**

1

1.      This is an action brought under the provisions of the Clean Water Act (CWA) 33 USC Section 1365(a)(1) by citizen plaintiffs seeking enforcement of the CWA against the defendant United States of America, the State of New Hampshire and the City of Portsmouth, New Hampshire.

## Jurisdiction and Venue

2.      This Court has jurisdiction over the subject matter of this action.

3.      Venue is proper in this Court in accordance because the waste water treatment facility, the subject of this action, is located in Portsmouth, New Hampshire.

## Standing

4.      The citizen plaintiffs have standing to bring this action. 33 USC Section 1365(g).

## Parties

5.      The defendant United States of America, acting through the Environmental Protection Agency (EPA), is charged with the responsibility to enforce 13 USC 1251-1388, the Clean Water Act, as it relates to publicly owned waste water treatment facilities ("WWTFs").

6.     The defendant State of New Hampshire, acting through the New Hampshire Department of Environmental Services (NHDES), is charged with the responsibility to enforce RSA Chapter 485-A, Water Pollution and Waste Disposal as it relates to publicly owned WWTFs.

7.     The defendant City of Portsmouth, New Hampshire (City) is a municipality charged with the responsibility of complying with the CWA and RSA Chapter 485-A in the construction, operation and maintenance of its WWTF.

## The Peirce Island WWTF and Litigation History

8.     In the 1960s, the City of Portsmouth (City) constructed a waste water treatment facility (WWTF) on Peirce Island located in the Piscataqua River. Peirce Island lies just off the City waterfront and its historic downtown. The WWTF provided and still provides only primary treatment to the sewage directed to the facility by the City collection system. The City sewage collection system was, and remains, a combined storm and sewage collection system. In wet weather both sewage and storm water enter the WWTF for treatment. The combined sewage and storm water that exceed the capacity of the WWTF is discharged untreated into South Mill Pond and the Piscataqua River through combined sewer overflows (CSOs).

9.     The City has done work to separate the combined sewer and storm water collection system but CSOs remain that discharge raw sewage into South Mill Pond and the Piscataqua River.

3

10.     In 1985, the United States Environmental Protection Agency (United States) issued a NPDES Permit and granted the City a waiver from its CWA obligation to provide secondary treatment allowing the WWTF to discharge sewage into the Piscataqua River and the Great Bay without secondary treatment. The NPDES permit and waiver expired in 1990.

11.     In September 1990, the State of New Hampshire reported to Congress that the Piscataqua River was not supporting designated uses and was in violation of water quality standards (WQS) for coliform bacteria. The report identified implementation of a CSO strategy in the City and an upgrade of the Peirce Island WWTF as required actions to address the violations of the WQSs.

12.     The United States continued the waiver from secondary treatment administratively for more than 15 years over a time period that included numerous violations of the CWA, including the failure of the WWTF to provide even primary treatment to its sewage as required by the 1985 NPDES permit.

13.     On April 10, 2007, 22 years after the issuance of the 1985 permit, the United States issued a NPDES Permit which included discharge limits based upon secondary treatment.

14.     On August 1, 2009, the United States filed a Complaint in United States District Court, District of New Hampshire, Case No. 09-cv-283-PB alleging multiple violations of the 2007 NPDES permit including CSO violations resulting in discharges of e coli and coliform bacteria that cause and will continue to cause water quality violations in the Piscataqua River and South Mill Pond; and, violations of the effluent limit limitations including biological oxygen demand (BOD5) and total suspended solids (TSS) into the Piscataqua River that cause and continue to cause water quality violations in the Piscataqua River in violation of the CWA.

4

14.     On September 24, 2009, a Consent Decree was entered in Case No. 09-cv-283-PB with the approval of the Court. The signatories to the Consent Decree were the United States, the Environmental Protection Agency, the State of New Hampshire and the City. The Consent Decree had key components intended to bring the City WWTF into compliance with the 2007 NPDES Permit and the CWA. The Consent Decree scheduled deadlines for compliance including: the CSO Nine Minimum Compliance Plan (Consent Decree, paragraph 8; the Waste Water Management Plan (Consent Decree, paragraph 9); Combined Sewer Overflow Upgrades to implement its Final Long Term Control Plan (Consent Decree, paragraph 10); and, the Post Construction Monitoring Plan (PCMP) to determine whether the Long Term Control Plan (LTCP) when completed meets all the design criteria and performance criteria specified in the Long Term Control Plan, the Combined Sewer Overflow Facility, the WWTF with respect to the treatment of combined sewage, comply with the technology-based and water quality based requirements of the CWA, the CSO Policy, and all applicable federal and state regulations and permits; and, that there are no CSO Discharges. (Consent Decree, paragraph 12).

15.     On February 15, 2013, the Consent Decree was modified. The basis for the modification was that the City had encountered construction delays in its project to separate storm sewer flows from waste water flows, the project contemplated by the Combined Sewer Upgrades requirement at paragraph 10 of the Consent Decree. The modification required the City to complete construction of secondary treatment facilities by March 1, 2017, in order to achieve compliance with treatment limits contained in the NPDES permit issued to the City by EPA on April 10, 2007.

16.     On June 14, 2016, 2016, the plaintiff United States of America filed its Motion to Enter Consent Decree Second Modification with the Court. The United States, the State of New Hampshire, the City and the Conservation Law Foundation were signatories to the Second Modification.

5

17.     On September 28, 2016, the Court issued a Memorandum and Order approving the Second Modification. The Second Modification requires that the City complete construction of secondary treatment facilities by December 1, 2019 that comply with permit limits.[1]

### Peirce Island WWTF Consent Decree Compliance and Plan for the Peirce Island Project

18.     The Consent Decree required that the City develop a Wastewater Master Plan. (WMP). (Consent Decree, Paragraph 9). The Final Supplement to the WMP and Long Term Control Plan (LTCP) was published by City consultants Weston & Sampson and Brown and Caldwell on November 15, 2010.

19.     The Final Supplement was preceded by a June 2010 Draft Wastewater Master Plan with five (5) Technical Memoranda with Appendices. The Weston & Sampson and Brown and Caldwell WMP assessed flows and loads with forecasted conditions, the collection system, project boundaries, regulatory requirements, CSO abatement progress, the WWTF process and siting, population and growth and other matters.

20.     In Technical Memorandum 5, pages 24-25, of the WMP, Weston & Sampson and Brown and Caldwell eliminated construction of the project on Peirce Island as an upgrade option because of space constraints.

_____

[1] The Order was not an approval of the Peirce Island project plans and specifications.

21.     The WMP preferred alternative was the expansion of the WWTF at Pease using the Pease outfall in a phased approach to become the WWTF for the City while the current Peirce Island plant becomes converted to a wet weather facility to enable the City to deal with storm water.

22.     In 2011, the City engaged the WWTF engineering company AECOM, with offices in Wakefield, Massachusetts, to conduct Pilot Studies to evaluate potential treatment technologies for providing secondary treatment and total nitrogen treatment including biological aerated filter (BAF), conventional activated sludge with BioMag (CASB) and moving bed bioreactor (MBBR) and Dissolved Air Flotation (DAF).

23.     The AECOM Final Phase 1 Technical Memorandum, dated September 26, 2011, in the Introduction, stated, incorrectly, that the Consent Decree required that the Peirce Island WWTF be upgraded to secondary treatment.

24.     The AECOM WMP Phase 2 Piloting Memorandum, dated September 28, 2012, recommended that the City pursue the preliminary design on Peirce Island for secondary treatment using the proprietary BAF system sized to treat an average daily flow of 6.13 million gallons per day (mgd) with the ability to meet an effluent total nitrogen of 8 milligrams per liter (mg/l) on a seasonal rolling average basis.

25.     The City thereafter began a process to engage an engineering firm to prepare the plans and specifications for a WWTF that would comply with the 2007 NPDES permit and Consent Decree.

26.     The City Request for Qualifications (RFQ) sought an engineering firm to prepare the plans and specifications for the upgrade of the Peirce Island WWTF notwithstanding the recommendations in the WMP that the plant not be constructed on Peirce Island.

27.     The RFQ, at page 3, stated that the recommended treatment technology for meeting secondary treatment limits at Peirce Island with the ability to treat total nitrogen of 8mg/L was BAF with an average annual design flow treatment capacity of 6.13 mgd.

28.     The City reduced the list of potential bidders to two: AECOM, of Wakefield, Massachusetts and Wright-Peirce, of Portsmouth, New Hampshire.

29.     Wright-Peirce, in its January 17, 2013, response to the RFQ, stated that BAF would be a mistake.

30.     Wright-Peirce recommended a conventional activated sludge secondary treatment technology with a maximum daily capacity of 15 mgd.

31.     AECOM recommended BAF with a maximum day capacity of 9.06 mgd.

32.     The City, on April 5, 2013, awarded the Peirce Island WWTF design project to AECOM.

33.     On December 30, 2015, the City, through AECOM, submitted the final design drawings and technical specifications for the Peirce Island WWTF to NHDES, Waste Water Engineering Bureau.

34.     On March 15, 2016, Stephen H. Roberts, P.E., Senior Sanitary Engineer, Waste Water Engineering Bureau, NHDES approved the AECOM design and authorized the project for construction bids.

35.     Various design modifications were submitted to and approved by Stephen H. Roberts subsequent to the March 15, 2016, approval.

36.     The City executed a project construction contract with Methuen Construction Company, Inc. on August 26, 2016, and issued a Notice to Proceed on September 1, 2016.

37.     On September 26, 2016, plaintiffs mailed their 60-day notice to defendants in accordance with 33 USC 1365 and 40 CFR 135.

38.     The City contractor began work in the first week of October, 2016.

39.     The Post Construction Monitoring Plan (PCMP) required by the Consent Decree at paragraph 12 was not completed and made available for public review until November 4, 2016.

40.     The AECOM plans and specifications were finalized and approved by NHDES before the PCMP was complete.


**Suitability of Design Flow Parameters of the Peirce Island Project to Meet the 2007 NPDES Permit, the Consent Decree as Modified and the Clean Water Act**


41.     The design parameters for the Peirce Island project as submitted to and approved by NHDES are maximum day capacity of 19.4 mgd and maximum hour capacity of 22 mgd through the Mechanic Street pump station with a secondary treatment average day of 6.13 mgd and peak day of 9.06 mgd using the BAF secondary treatment process. The 6.13 mgd monthly average day design is less than the projected average daily flow for 2030 0f 6.38 mgd based upon moderate growth of 1% (including residential and employment projections) detailed in the June 2010 Draft Wastewater Master Plan.


42.     Flows exceeding the secondary treatment capacity will bypass the BAF. The Peirce Island plant design for wet weather flow events and frequency did not establish the flow and loading limits for the blended total secondary and primary CEPT effluent necessary to meet NPDES permit limits on a monthly basis.


43.     The plant design does not provide for the volume of monthly, weekly and daily wet weather peaks through CEPT combined with the secondary treatment effluent that will comply with NPDES permit limits.


44.     The plant design does not provide an adequate process for the removal of fats, oils and grease (FOG). The BAF secondary treatment for both carbonaceous (BOD5) organics removal

and nitrification is sensitive to clogging. The plant design includes primary screening together with primary clarifiers but the design does not provide the level of FOG removal nor a process specific to FOG removal.

45.     The PCMP, which was not made final until after the Peirce Island plans and specifications were approved by NHDES on March 15, 2016, is incomplete and unsatisfactory. Data from the permanent flow meters at the South Mill Pond outfalls and data from the Mechanic Street pump station presented in the PCMP to show the balance of flows to the WWTF and the CSOs during dry weather and wet weather conditions fail to demonstrate that the LTCP target of 2.1 million gallons per year will be met.

46.     The Peirce Island WWTF was designed to fit into the confines of the existing site and must run at optimum performance levels from start up on.

47.     The project has no option for expansion.

48.     Difficult operational considerations will control the safety of the plant. The mudwell is planned to be underneath the BAF filter structure. The back flow (concentrated organic waste) must be flushed out frequently (at least twice per week) and removed to the sludge handling facilities. It may not be allowed to decompose anaerobically in the confined space. Building air exchanges are required for operator safety where aerosols are released from open wastewater treatment tanks inside an enclosure.

49.     The plant will be very expensive to run with high operation and maintenance costs.

**Clean Water Act Responsibilities-United States, the State of New Hampshire and the City of Portsmouth**

50.     The defendant United States acting through the Environmental Protection Agency (EPA) has the responsibility for issuing NPDES permits in New Hampshire pursuant to 33 USC 1342 (a) of the Clean Water Act.

51.     The defendant United States acting through the EPA has the responsibility to oversee the State of New Hampshire administration of the CWA pursuant to 33 USC 1313 (c)-(d).

52.     The defendant State of New Hampshire acting through NHDES pursuant to 33 USC 1313 (d)(1)(A)-(B) CWA has the responsibility to identify the waters within its boundaries for which effluent limitations are required by 33 USC 1311(b)(1)(A) CWA and 33 USC 1311(b)(1)(B) CWA, which results in the impaired waters list. The impaired waters list is the predicate for the clean-up plan or Total Maximum Daily Load (TMDL) for the impaired waters. 33 USC 1313.

53.     The defendant State of New Hampshire acting through NHDES pursuant to Chapter RSA 485-A, Water Pollution and Waste Disposal and Chapter Env-Wq 700 Standards of Design and Construction for Sewerage and Wastewater Treatment Facilities has the responsibility to approve the design of publicly owned WWTFs to ensure that the WWTF

complies with the CWA, Chapter RSA 485-A and Env-Wq 1700, Surface Water Quality Regulations.

54.    The defendant City of Portsmouth, New Hampshire has the responsibility to comply with the 2007 NPDES permit and foreseeable future permits, the September 24, 2009, Consent Decree as modified and the CWA.

**The United States and the State of New Hampshire Have Failed to Diligently Exercise the Enforcement Responsibility Placed Upon Them by the CWA-Conduct Which Will Result in Continuing Violations of the 2007 NPDES Permit, the Consent Decree and the CWA by the City**

**Environmental Protection Agency**

55.    On December 18, 2012, the AECOM, the City WWTF engineering consultant, presented its WMP Phase 2 Piloting Memorandum to EPA and NHDES for review. The Memorandum set forth a Peirce Island sizing recommendation of an average annual flow of 6.13 mgd, a maximum monthly flow of 8.86 mgd and a maximum daily flow of 9.06 mgd using BAF secondary treatment technology.

56.    Concerns about the Peirce Island sizing proposal were expressed by EPA and NHDES at the December 18, 2012, meeting causing suggestions that the project be delayed.

57.    The City rejected any suggestion that the project be delayed.

58.     On January 30, 2013, Denny Dart, Manager, Water Technical Unit, EPA wrote to Peter Rice, PE, Deputy Director of Public Works regarding NPDES Permit No. NH0100234, Consent Decree Docket No. 09-cv-283 PB, *Wastewater Master Plan Phase 2 Initial Piloting Technical Memorandum*, 2 Volumes, prepared by AECOM, dated September 27, 2012, expressing concerns about the capacity of the proposed WWTF.

59.     The Dart letter raised substantial doubts about the plant design, including, *inter alia*, whether the secondary treatment system would be adequately sized to treat all dry-weather flow and an appropriate portion of wet weather flow in accordance with the widely accepted WWTF design standards set forth in TR-16, Guides for the Design of Waste Water Treatment Works (NEIWPCC, 2016).

60.     The AECOM Technical Memorandum provided that flows exceeding design would bypass secondary treatment and receive chemically enhanced primary treatment (CEPT) and disinfection prior to discharge into the Piscataqua River. Ms. Dart questioned whether during wet weather the blended effluent would comply with the effluent limitations in the 2007 NPDES permit as well as a monthly average total nitrogen limit of 8 mg/l.

61.     The AECOM Technical Memorandum examined a 4.5 year WWTF flow data set and "parsed" the data set into dry and wet weather flows. Ms. Dart questioned whether the project would comply with the EPA Combined Sewer Overflow (CSO) Policy which requires the City to operate its combined sewer and storm (CSO) water collection system to implement the technology based nine minimum controls and implement a long term CSO control plan to achieve NPDES and CWA compliance, including compliance with 40 CFR Part 122.41(m)(4).

62.     The Dart concerns expressed in her January 30, 2013, letter regarding the CSO Policy and CSO Nine Minimum Compliance Plan are City obligations included in the Consent Decree as modified.

63.     Ms. Dart reviewed the October 30, 2012, Quarterly Report required by the Consent Decree and raised concerns: a. whether the plant upgrade design would comply with the 2007 NPDES permit and a draft permit that would have a total nitrogen limit of a monthly average of 8 mg/l with information about future limits of monthly average of 3 mg/l; b. why the CEPT facility was violating interim effluent limits for BOD; and, noting that the Consent Decree requires the PCMP in order that an assessment could be made towards meeting the goal of the Long Term Control Plan, the 1994 CSO Policy and the CWA.

64.     Notwithstanding the Dart concerns, its NPDES permit responsibilities and its responsibility to oversee the State of New Hampshire administration of the CWA pursuant to 33 USC 1313 (c)-(d), the EPA did not review the development of the plans and specifications by AECOM for the City.

65.     The EPA placed the responsibility for the review of the project plans and specifications on the New Hampshire Department of Environmental Services.

66.     The EPA did not conduct a diligent analysis or review of the Peirce Island plans and specifications as required by law.

67.     The Peirce Island WWTF, if constructed in accordance with the AECOM plans and specifications, will result in continuing violations of the 2007 NPDES permit, the Consent Decree as modified and the CWA.


### New Hampshire Department of Environmental Services


68.     NHDES attended the December 18, 2012, the AECOM WMP Phase 2 Piloting Memorandum, dated September 28, 2012, was presented to the EPA and NHDES for review with the sizing recommendation of an average annual flow of 6.13 mgd, a maximum monthly flow of 8.86 mgd and a maximum daily flow of 9.06 mgd using BAF secondary treatment technology.


69.     The concerns expressed by the EPA in the January 30, 2013, Dart letter about the AECOM Memorandum were shared by the NHDES, Wastewater Engineering Bureau, including flows and loads, wet and dry weather flows parsing, the definition of wet weather flow, extraneous flow reduction, projections of days per year that bypasses of the proposed secondary treatment system will occur after the completion of the sewer separation projects identified in the consent Decree, CSO discharge volumes, the size of rain events that cause CSO discharges and infiltration and inflow.


70.     The City rejected suggestions that the project be delayed for additional analysis.


71.     NHDES acceded to the City demand that the project planning be commenced without the analysis required by Chapter RSA 485-A and Chapter Env-Wq 700.

72.     On March 15, 2016, NHDES approved the design plans and specifications for the Peirce Island project.

73.     RSA 485-A:4, V11 requires that NHDES investigate and approve the plans and specifications of sewage treatment systems.

74.     RSA 485-A:4, IX requires that NHDES set standards of design and construction for sewage treatment systems. Those standards are set forth in Chapter Env-Wq 700.

75.     Chapter Env-Wq 700 requires NHDES analysis of geographical, environmental, physical and engineering details for proposed facilities.

76.     Env-Wq 704.03 <u>Design Flow Basis</u> at 704.03(b)(1) requires that sanitary waste flows for commercial area be estimated using Tables 3-3, 3-4 and 3-5 of Metcalf and Eddy/AECOM, <u>Wastewater Engineering Treatment</u>, 5th Edition.

77.     Env-Wq 703.03(b)(2) requires that sanitary waste for residential areas for an average daily per capita flow be estimated as specified in Table 3-2 of Metcalf and Eddy/AECOM, <u>Wastewater Engineering Treatment</u>, 5th Edition.

78.     Env-Wq 703.03(c) requires that sewerage infrastructure be designed to carry a peak hourly flow at full pipe capacity, calculated as the product of the average daily flow for a service

area multiplied by a peaking factor. Env-Wq 703.04(d) states that peaking factors for average daily flows in excess of 100,000 gpd shall be derived from Figure 2.1 of TE-16 Guides for the Design of Wastewater Treatment Works, New England Interstate Water Pollution Control Commission, 2011 Edition.

79.     Env-Wq 706.04 requires that NHDES examine the design regarding the degree of treatment that a WWTF project meet the effluent discharge limitations and water quality standards of state permits, surface water quality standards as set forth in Chapter Env-Wq 1700 et seq., the NHDES permit and the CWA.

80.     Env-Wq 707.01 provides design criteria for operational flexibility, including for extreme weather and population fluctuations which have a recognized potential to adversely affect a proposed treatment process.

81.     Env-Wq 707.03(g) requires NHDES analysis of the sampling results for influent wastewater parameters for BOD5, TSS, pH, Total Kjeldahl nitrogen (TKN) and others for upgrades to existing WWTFs.

82.     Env-Wq 707.04 requires NHDES design analysis of, amongst other factors, an evaluation of future expansion requirements. (Env-Wq 707.04 (c)(1); storm water flows for WWTFs with combined sewers within the service area (Env-Wq 707.04(c)(3); a mass balance analysis for average conditions and appropriate peaking factors used for peak design conditions. (Env-Wq 707.04(c)(6)(a); a mass balance analysis for BOD5 and TSS loadings for the process and side streams. Env-Wq 707.04(c)(6)(b); a mass balance analysis for nutrient loadings. (Env-Wq 707.04(c)(6)(c); a hydraulics analysis of the treatment process indicating water surface elevations for peak hourly flow and annual average design flows against 25-year flood and

average levels of receiving waters. (Env-Wq 707.04 (d)(1); an analysis of present and proposed future discharge permit limits (Env-Wq 707.04(e); and, and analysis of the effect on the WWTF of industrial wastes likely to be encountered in the influent waste stream. (Env-Wq 707.04(f).

83.     Env-Wq 708.05 (a)-(c) requires that the project design include locations of foreseeable future facilities including hydraulics, piping, valves and gates all to facilitate expansion with minimal interruption to operating facilities.

84.     NHDES did not conduct a diligent analysis or review of the Peirce Island plans and specifications as required by law and if the Peirce Island WWTF is constructed in accordance with those plans and specifications the project will result in continuing violations of the 2007 NPDES permit, the Consent Decree as modified and the CWA.

**The City of Portsmouth Has Commenced Construction of a WWTF on Peirce Island Which Will Result in Continuing Violations of the 2007 NPDES Permit, the Consent Decree and the CWA**

85.     The City began construction of a WWTF on Peirce Island in September, 2016, in accordance with the AECOM plans and specifications.

86.     The Peirce Island site is constrained spatially and geographically.

87.     The Peirce Island WWTF cannot be constructed beyond the existing fence line because of the impacts on historic Fort Washington.

88.     The Peirce Island WWTF cannot be constructed beyond the existing fence line because of improvements funded with federal grants with restrictions.

89.     The Peirce Island WWTF cannot be constructed on Peirce Island because of the impacts on historic downtown Portsmouth.

90.     The City plans and specifications, which include the BAF technology selected to provide secondary treatment, were developed to meet the physical constraints of the site rather than conform to the design standards required by Chapter Env-Wq 700 at Env-Wq 704.03 (b)-(d).

91.     The City failure to comply with design standards will result in continuing violations of effluent quality requirements set forth Env-Wq 706.04.

92.     The physical constraints of the Peirce Island site will prevent foreseeable future expansion and upgrades occasioned by more stringent permit limitations, population growth, residential and commercial development, rising tidal flows and sea levels and other factors in violation of Env-Wq 708.05.

93.     The Peirce Island project will, if constructed, continue to violate the 2007 NPDES permit, the Consent Decree as modified and the CWA.

**Claims for Relief**

80. Plaintiffs restate the facts set forth in paragraphs 1-86 of the Complaint.

94.     Plaintiffs request:

a. An Order of Court that enjoins the City of Portsmouth to construct a waste water treatment facility sized adequately to handle all the sewage inflow from the collection system that is fully compliant with the 2007 NPDES permit and foreseeable future permits, the Consent Decree as modified and the CWA;

b. An Order awarding plaintiffs' attorneys' fees, expert fees and related costs and expenses all as authorized by the 13 USC 1365(d) of the CWA; and,

c. Such other and further relief proper in the matter.

Respectfully submitted,

November 30, 2016                              /s/ Arthur B. Cunningham

Attorney for Plaintiffs

PO Box 511, 79 Checkerberry Lane

Hopkinton, NH 03229

603-746-2196 (O); 603-219-6991 (C)

gilfavor@comcast.net

No. 18301

21