**Roger Pitroff, et al.**

v.                                          Case No. 16-cv-522-PB
                                            Opinion No. 2017 DNH 158
**United States of America, et al.**

## MEMORANDUM AND ORDER

The City of Portsmouth has been discharging inadequately
treated sewage into the Piscataqua River and the Great Bay
estuary for many years.  In 2007, the United States attempted to
address this problem by issuing the City a National Pollutant
Discharge Elimination System ("NPDES") permit that for the first
time requires the City to provide secondary treatment to its
wastewater discharges.  After the City failed to comply with the
permit, the United States sued the City, alleging violations of
both the NPDES permit and the Clean Water Act (the "Act"), 33
U.S.C. §§ 1251—1388.  The State of New Hampshire later
intervened and added its own claims against the City based on
state environmental laws.  In 2009, the parties agreed to a
consent decree to address the City's violations and the consent
decree has since been modified twice.  The City plans to meet
the requirements of the permit and the consent decree in part by
upgrading its existing wastewater treatment facility on Peirce
Island.

The current action is a "citizens suit," filed by sixteen Portsmouth residents who claim that the proposed upgrade to the Peirce Island facility will not bring the City into compliance with the Clean Water Act. Plaintiffs allege that the City, the State of New Hampshire, and the United States are liable as primary violators of the Act. They also allege that the United States is separately liable because it has failed to fulfill several nondiscretionary duties that the Act requires it to assume when overseeing the City's compliance efforts.

Defendants have filed motions to dismiss arguing that the Act does not authorize plaintiffs' claims. To the extent that plaintiffs contend that the defendants are liable for failing to comply with the Act's effluent standards, defendants argue that plaintiffs' claims are barred because the United States and the State of New Hampshire are "diligently prosecuting" their own Clean Water Act claims against the City. The United States also argues that the plaintiffs' separate claim against it must be dismissed because plaintiffs cannot point to any nondiscretionary duties that the United States has failed to fulfill.

## I. <u>BACKGROUND</u>

The United States issued an NPDES permit to the City in 2007 that authorizes it to make discharges from its Peirce

2

Island wastewater treatment plant and three combined sewer overflows ("CSOs").  For the first time, the permit requires the City to provide secondary treatment to its wastewater discharges.  See Doc. No. 1 at 4.  After the City failed to comply with the permit, the United States filed an action in this court alleging violations of the permit and the Clean Water Act.  Doc. No. 1 at 4-5, United States v. City of Portsmouth, No. 09-cv-283-PB (D.N.H. Aug. 17, 2009) (the "enforcement action" ("EA")).  The State of New Hampshire subsequently intervened and filed a complaint alleging that the City's discharges also violate state law.  EA Doc. No. 4 at 4-5.

The parties later agreed to a consent decree that obligates the City to take several steps to bring its wastewater practices into compliance with the NPDES permit and the Act.  The consent decree requires the City to implement a compliance plan, implement a wastewater master plan, perform CSO upgrades, comply with interim effluent limits until secondary treatment facilities are constructed, submit and comply with a post-construction monitoring plan, and comply with reporting requirements.  See EA Doc. No. 8 at 5-12.  In September 2009, I approved the consent decree.

In July 2012, the United States lodged a proposed modification ("the First Modification") to the consent decree.  EA Doc. No. 10-1.  The parties agreed to the modification

because the City encountered unexpected geological and financial conditions.  The Conservation Law Foundation ("CLF") intervened to request that I more closely monitor the EPA's management of the consent decree.  Because the other parties did not request such oversight, and there was no reason to believe that the City's delay was unreasonable, I denied CLF's motion for greater oversight.  The First Modification contains two main provisions. The first extended the schedule for completing the CSO upgrades from 2013 to 2014.  The second established a construction schedule for secondary treatment facilities that required completion by March 2017.  In February 2013, I approved the First Modification.

On April 1, 2016, the United States lodged another proposed modification ("the Second Modification") to the consent decree. EA Doc. No. 38-1.  The Second Modification was forged by the settling parties when it became clear that the City would be unable to meet its March 2017 deadline for completing construction of secondary treatment facilities.  The Second Modification responds to this change of circumstances and contains four main provisions.  The first extends the deadline for substantial completion of secondary treatment facilities to December 1, 2019.  Related deadlines are set for executing the construction contract, submitting the contractor's detailed schedule, and complying with permit limits.  The second seeks to

hold the City accountable for any deviations from the revised timeline through a schedule recovery program.  The third requires the City to report regularly to the EPA, the State, and CLF.  The fourth implements mitigation measures that are intended to counteract pollution stemming from the City's continued violation of its permit and the failure to meet the existing construction deadline.  The mitigation measures include enhanced primary treatment, new nitrogen limits, stormwater pollution reduction, an expanded sewer, and funds for related environmental projects.

A week after lodging the Second Modification, the United States published a notice in the Federal Register soliciting comments from the public.  The Second Modification received twenty-three comments, some of which came from Portsmouth residents disappointed by the City's intention to locate a secondary treatment plant on Peirce Island.  Some residents wanted the City to instead build a secondary treatment facility at a different location, such as the Pease Tradeport.  After considering the comments, the United States moved to enter the Second Modification on June 14, 2016.  EA Doc. No. 43.

On May 31, 2016, a group of Portsmouth residents filed a motion to intervene.  EA Doc. No. 40.  No party challenged their standing, and I permitted them to intervene to voice their concerns with the Second Modification.  EA Doc. No. 58 at 5–6.

I allowed them to participate in briefing in response to the
motion to approve the Second Modification, appeal from any
adverse decision, and participate in regular interactions with
the parties concerning the Second Modification.  The residents
submitted a response and surreply.  In September, I held a
hearing on whether to approve the Second Modification.  The
hearing was attended by counsel for the City, the State, the
United States, CLF, and the intervening residents.

I issued a Memorandum and Order approving the Second
Modification on September 28, 2016.  See EA Doc. No. 66.  In
reaching this decision, I first found that a modification was
warranted by changed factual circumstances because the settling
parties agreed that the City could not meet its March 2017
deadline to construct secondary treatment facilities, even under
a very aggressive construction schedule.  EA Doc. No. 66 at 13–
15.  I noted that "[t]his failure [was] attributable to the
City's effort, over the course of a year and a half, to evaluate
an alternative construction location and design at Pease
Tradeport."  Id. at 13–14.  Next, I found that the proposed
Second Modification was suitably tailored to the changed factual
circumstances.  Id. at 15–18.  I emphasized that the diverse
parties supporting it — the federal government, the state
government, the city charged with implementing it, and a
prominent nongovernmental environmental organization — "reflect

a balance of concerns" and were "well-situated to forge a
solution." Id. at 16. Giving appropriate deference to the
settling parties, I approved the Second Modification.

In doing so, I noted the intervening residents' concerns:

> They are concerned that construction at Peirce Island would
> disrupt life, commerce, and historic buildings in
> Portsmouth. They are also concerned that a Peirce Island
> plant would lack adequate capacity. But they largely
> express these concerns through questions reflecting a
> desire for greater information, rather than affirmative
> demonstrations.
>
> More fundamentally, the residents' primary concerns and
> arguments reach beyond the scope of their limited
> intervention in this action. I have restricted the
> residents' participation to issues that are presently
> before me. Thus, it is crucial to note that the Second
> Modification neither mandates that the City locate a
> secondary treatment plant at Peirce Island nor requires the
> City to select the granular engineering design details that
> it has. Thus, the residents' arguments largely fall
> outside the scope of their limited intervention.

Id. at 16-17.

Plaintiffs filed this action two months after I approved
the second modification. They allege that the United States
failed to adequately review the Peirce Island design; the design
is inadequate; and the City will continue to violate the NPDES
permit, the consent decree, and the Act even after the Peirce
Island upgrade is completed. See Doc. No. 39 at 10-12, 15-17,
21-22. Plaintiffs' principal claim is that the United States,
the State, and the City are liable pursuant to 33 U.S.C. §
1365(a)(1) because the proposed upgrade will not bring the City

into compliance with the permit, the consent decree, and the Act. They also argue that the United States is liable pursuant to § 1365(a)(2) because it has failed to comply with certain nondiscretionary duties that the Act requires it to assume when supervising the City's compliance efforts.

## II. __STANDARD OF REVIEW__

Defendants base their motions to dismiss on both Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). Rule 12(b)(1) is used to attack the court's subject-matter jurisdiction and Rule 12(b)(6) provides a path to challenge the sufficiency of the complaint. In cases such as this one, where the defendants have not challenged the predicate facts on which a plaintiff's jurisdictional claims are based, the court must assume the truth of plaintiff's well-pleaded factual allegations and construe the claims in the light most favorable to the plaintiff, regardless of whether a motion to dismiss is based on Rule 12(b)(1) or Rule 12(b)(6). See McCloskey v. Mueller, 446 F.3d 262, 266 (1st Cir. 2006); Roman-Oliveras v. Puerto Rico Elec. Power Auth., 655 F.3d 43, 45 & n.3, 49 (1st Cir. 2011). When a claim is construed in this manner, it will survive dismissal under either rule only if the claim is plausible on its face. See Roman-Oliveras, 655 F.3d at 45 & n.3, 49; see also Silha v. ACT, Inc., 807 F.3d 169,

174 (7th Cir. 2015) (Rule 12(b)(1)); Sepúlveda-Villarini v. Dep't of Educ., 628 F.3d 25, 29 (1st Cir. 2016) (Rule 12(b)(6)).

The only difference between the standard that governs a facial challenge to jurisdiction under Rule 12(b)(1) and a sufficiency challenge under Rule 12(b)(6) concerns the materials a court may consult when ruling on a motion to dismiss. When considering a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), a court may need to consider extrinsic materials submitted by a plaintiff even when reviewing a facial challenge to jurisdiction. See Dynamic Image Techs. Inc. v. United States, 221 F.3d 34, 37 (1st Cir. 2000). In contrast, the court ordinarily should confine its review to the complaint and a limited subset of documents such as those incorporated in the complaint by reference and matters of public record when determining whether the complaint states a claim for relief. See Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc., 524 F.3d 315, 321 (1st Cir. 2008).

In the present case, neither side objects to the materials cited by their opponents. Because dismissal is required when I consider these materials regardless of whether I analyze the parties' arguments under Rule 12(b)(1) or Rule 12(b)(6), I turn to the merits without attempting to specify which subsection of Rule 12(b) applies.

###                              III.   ANALYSIS

Defendants challenge plaintiffs' § 1365(a)(1) claim by
arguing that it is subject to the diligent prosecution bar
established by § 1365(b)(1)(B).  The United States also contends
that plaintiffs' § 1365(a)(2) claim must be dismissed because
plaintiffs cannot point to any nondiscretionary duty that the
Administrator of the EPA has failed to perform.  I address
defendants' challenge to each claim in turn.[1]

### A.   Section 1365(a)(1) Claim

A claim based on § 1365(a)(1) is barred "if the
Administrator [of the EPA] or State has commenced and is
diligently prosecuting a civil or criminal action in a court of
the United States, or a State to require compliance with the
standard, limitation, or order."  § 1365(b)(1)(B).  Defendants
argue that plaintiffs' § 1365(a)(1) claim is subject to the
diligent prosecution bar because the United States and the State
of New Hampshire are diligently prosecuting their own civil

---

[1] Defendants do not challenge plaintiffs' standing to sue.
Although the current version of the complaint does not plead
sufficient facts to support a claim that any of the plaintiffs
have standing, affidavits submitted by the plaintiffs in the
original enforcement action satisfy me that one or more of them
have standing to bring the current claims.  See EA Doc. Nos. 40-
7 (injury to waterfront business owner), 40-10 (injury to
charter-fishing business owner), 40-12 (injury to recreational
user of affected waters).  Accordingly, I reach the issues
raised by the parties without determining whether all of the
plaintiffs have standing.

enforcement action against the City for the same alleged Clean Water Act violations.[2]

The Supreme Court has emphasized that "the citizen suit is meant to supplement rather than to supplant governmental action." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., 484 U.S. 49, 60 (1987). Indeed, Congress intended "[t]he great volume of enforcement actions [to] be brought by the State." N. & S. Rivers Watershed Ass'n v. Town of Scituate, 949 F.2d 552, 557 (1st Cir. 1991) (quoting Gwaltney, 484 U.S. at 60). In this vein, the First Circuit identified the "primary function" of citizen suits as "enabl[ing] private parties to assist in enforcement efforts where Federal and State authorities appear unwilling to act" or "fail to exercise their enforcement responsibility." See id. at 555, 557 (quoting Gwaltney, 484 U.S. at 60 in last instance). Accordingly, "when it appears that governmental action under the [Act] . . . begins and is

_____

[2] The plaintiffs do not adequately allege violations different from those that the United States is prosecuting in the existing enforcement action. Thus, the question before me is whether the United States' prosecution is diligent.

Although plaintiffs' most recent amended complaint alleges that there is an active, illicit CSO at Marcy Street, they may not commence a citizen suit on the basis of that allegation because they failed to include it in their notice to the defendants, as required under the Act. See § 1365(b)(1)(a); Doc. Nos. 39 at 3, 11-12; 42-2. In any event, the allegation does not bear on the United States' diligence because the citizens do not allege that the United States knew of the CSO.

diligently prosecuted, the need for citizen's suits vanishes."
Id.

Plaintiffs do not allege that the United States "has engaged in a pattern of conduct in its prosecution of the [City] that could be considered dilatory, collusive or otherwise in bad faith."  See Connecticut Fund For Env't v. Contract Plating Co., 631 F. Supp. 1291, 1293 (D. Conn. 1986) (finding diligence where there was no procedural dereliction and enforcement action yielded settlement).  Nor do plaintiffs allege the kind of procedural default or laggardly movement that amounts to non-diligent prosecution.[3]  See, e.g., Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC, 141 F. Supp. 3d 428, 441–43 (M.D.N.C. 2015) (finding non-diligence where state failed to move suit forward through discovery or depositions and let case lie dormant for over a year; moreover, state ultimately moved to stay its own action); Ohio Valley Envtl. Coal. v. Hobet Mining, LLC, Civil Action No. 3:08-0088, 2008 WL 5377799, at *5-6 (S.D.W.Va. Dec. 18, 2008) (finding non-diligence where, inter alia, state let case lie dormant for more than a year).

---

[3] Indeed, the City failed to meet its secondary treatment deadline in part because it undertook a study of the feasibility of constructing secondary treatment facilities at the Pease Tradeport.  The citizens favor constructing facilities there in lieu of Peirce Island, even though that would delay secondary treatment even longer.

Plaintiffs also are in no position to credibly claim that
the current consent decree lacks enforcement mechanisms to hold
the City accountable if it fails to meet its obligations under
the consent decree.  The consent decree imposes concrete
deadlines for both completing construction of secondary
treatment facilities and achieving compliance with permit
limits.  See EA Doc. No. 67 at 4-5; Piney Run, 523 F.3d at 461
(assuming relevance of final compliance deadline); Scituate, 949
F.2d at 557 (factoring expenditures to plan new treatment
facility into diligence analysis).  The decree also pushes the
City to move swiftly via interim deadlines and holds the City
accountable by requiring it to monitor discharges and report
construction progress to the settling parties on a monthly
basis.  See EA Doc. No. 67 at 4–5; Scituate, 949 F.2d at 557
(factoring monitoring into diligence analysis); Williams Pipe
Line Co. v. Bayer Corp., 964 F. Supp. 1300, 1325 (S.D. Iowa
1997) (factoring progress reports into diligence analysis).
Accordingly, the current version of the consent decree
"represents a substantial, considered and ongoing response to
the violation[s]."  See Scituate, 949 F.2d at 557.

The deadlines also have bite.  The consent decree requires
extra labor costs if doing so "is the only means capable of
achieving compliance."  EA Doc. No. 67 at 5.  Further, the
decree establishes daily financial penalties for noncompliance,

with the penalties accruing per violation per day and the daily penalty increasing the longer the City fails to comply. See EA Doc. Nos. 8 at 15–17; 67 at 9; cf. Grp. Against Smog, 810 F.3d at 130–32 (finding diligent prosecution where, inter alia, penalties were stipulated); Atl. States Legal Found. v. Hamelin, 182 F. Supp. 2d 235, 246–47 (N.D.N.Y. 2001) (treating penalties as relevant); Piney Run, 523 F.3d at 460–61 (same); Scituate, 949 F.2d at 557 (same). Moreover, the penalties stipulated by the consent decree may exceed the maximum amount provided by the Act. Compare § 1319(g) with EA Doc. Nos. 8 at 15–17; 67 at 9.

The consent decree also mandates a number of mitigation measures designed to protect the health of the affected bodies of water, which are polluted daily from effluent that currently receives only primary treatment. Cf. Gwaltney, 484 U.S. at 61 (suggesting that the "the Administrator's discretion to enforce the [Act] in the public interest" may include foregoing civil penalties and requiring corrective action instead). These measures include providing enhanced primary treatment, complying with new nitrogen limits from 2020 through 2025, spending $500,000 to reduce stormwater pollution, spending another $500,000 on community efforts to improve watershed health, and constructing an expanded sewer system at an estimated cost of $2.5 million. EA Doc. No. 67 at 5–9. The imposition of such measures further supports a finding of diligence on the part of

the United States.  See Atl. States Legal Found., 181 F. Supp.
2d at 247 (considering remedial measures); Karr, 475 F.3d at
1194-95, 98 (noting that "the prosecution was not only diligent
but vigorous and thorough" where "in some respects the EPA
appears to have accomplished more through its consent decree
than [citizens] sought to achieve on their own").

Plaintiffs attach little significance to these accepted
indicia of diligent prosecution.  Instead, they argue that the
underlying action cannot be considered diligent because neither
the United States nor the State has attempted to prevent the
City from complying with the consent decree by building what the
plaintiffs contend will be an inadequately-sized secondary
treatment facility.  Unsurprisingly, the United States and the
State dispute plaintiffs' claim that the proposed treatment
facility is undersized, but I need not resolve this factual
dispute to determine whether defendants are diligently
prosecuting the underlying action.

The First Circuit has emphasized that courts "are not in
the business of planning, designing and constructing sewage
treatment facilities," Scituate, 949 F.2d at 557, yet plaintiffs
apparently request that I play that role, see Doc. No. 39 at 23
(requesting that I issue an injunction requiring construction of
a treatment facility "sized adequately" to handle the City's
sewage collection).  If, instead, the plaintiffs want an

injunction requiring the City to comply with its present permit limits — which clearly entails the construction of adequately sized facilities — the consent decree already does that.  See EA Doc. No. 67 at 4; see also Scituate, 949 F.2d at 556-57 (noting that "[d]uplicative enforcement actions add little or nothing to compliance actions already underway," and that "[w]here an agency has specifically addressed the concerns of an analogous citizen's suit, deference to the agency's plan of attack should be particularly favored").  The consent decree does not require all treatment facilities to be located at Peirce Island, or specify that a Peirce Island facility is the only means of achieving compliance.  Rather, it requires compliance with the NPDES permit by 2020 and imposes substantial, concrete measures directed at achieving that goal.  The plaintiffs do not challenge the adequacy of the penalties or the other means provided by the consent decree to promote compliance.

The United States' prosecution strategy is entitled to deference.  The United States has the primary enforcement responsibility and may exercise discretion in deciding how to enforce the Act in the public interest.  See Gwaltney, 484 U.S. at 60-1; Scituate, 949 F.2d at 556-57.  Indeed, "[t]he Supreme Court has recognized the importance of deference to the EPA's bargains," Karr 475 F.3d at 1197, and has emphasized the "danger" of "undermin[ing] the supplementary role envisioned for

16

the citizen suit" by allowing it to morph "from interstitial to potentially intrusive," Gwaltney, 484 U.S. at 60-61. Furthermore, the diligent prosecution bar "does not require government prosecution to be far-reaching or zealous," or to achieve compliance as quickly as citizens might wish. See Karr, 475 F.3d at 1197; cf. Scituate, 949 F.2d at 558. Here, the parties have agreed to a consent decree after arms-length negotiations that reasonably address ongoing violations by the City from many angles and creates significant penalties for noncompliance. See Karr, 475 F.3d at 1197-98 (collecting cases and noting importance of EPA's latitude to bargain for voluntary consent decrees). No more is required to qualify as diligent prosecution.

Plaintiffs argue that none of this matters because the Supreme Court held in Gwaltney that "a case is not being prosecuted diligently if [the citizens allege in good faith that] it will produce a result that will not comply with the Clean Water Act." Hearing Tr. at 41-44; cf. Gwaltney, 484 U.S. at 64-67. I reject the plaintiffs' reading of Gwaltney. Gwaltney did not address the diligent prosecution bar. Instead, the court merely held that the Act "does not permit citizen suits for wholly past violations." Gwaltney, 484 U.S. at 52, 56-64; see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 175 (2000) (explaining that Gwaltney

"held that citizens lack statutory standing under § [1365](a) to sue for violations that have ceased by the time the complaint is filed," and noting that the Act "also" separately bars citizen suits under the diligent prosecution exception); Friends of Santa Fe Cty. v. LAC Minerals, Inc., 892 F. Supp. 1333, 1346 n.10 (D.N.M. 1995) (stating that Gwaltney "had nothing to do with . . . the [diligent prosecution] bar on citizen suits"). The Gwaltney Court interpreted § 1365(a)(1)'s "alleged to be in violation" requirement, which the court held is satisfied "when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation." Gwaltney, 484 U.S. at 64. In this way, the plaintiffs here confuse a necessary condition for commencing a citizen suit with a sufficient condition. In short, Gwaltney does not address the diligent prosecution exception and it therefore provides no support for the plaintiffs' position.[4]

---

[4] Plaintiffs have asserted their § 1365(a)(1) claim against all three defendants. In determining that the diligent prosecution bar precludes plaintiffs' claims under this provision, I do not mean to imply that the plaintiffs' claims against the United States and the State would otherwise be sufficient. Section 1365(a)(1) claims may only be brought against defendants who violate either an effluent standard or limitation or a state or federal order implementing a standard or limitation. Plaintiffs' claims against the United States and the State are also deficient because they do not sufficiently allege that either defendant violated § 1365(a)(1).

## B.  __The Nondiscretionary Duty Requirement__

The plaintiffs also bring a citizen suit claim against the United States under § 1365(a)(2).[5]  The United States argues that the plaintiffs may not do so because they have not adequately identified a nondiscretionary duty under the Act that the Administrator has failed to perform.  For the following reasons, I agree.[6]

Section 1365(a)(2) provides that "any citizen may commence a civil action on his own behalf . . . against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under [the Act] which is not discretionary with the Administrator."  § 1365(a)(2).  Nondiscretionary duties are those that are mandatory or ministerial.  See Envtl. Def. Fund v. Thomas, 870 F.2d 892, 899 (2d Cir. 1989) (contrasting "purely

---

[5] Section 1365(a)(2) authorizes citizen suits against the Administrator, not the United States.  Although plaintiffs have sued the United States, I treat their § 1365(a)(2) claim as if it had been brought against the Administrator for purposes of analysis.

[6] It is unclear whether plaintiffs also assert a § 1365(a)(2) claim against the State.  Any such claim would have to be dismissed for the additional reason that the plain language of § 1365(a)(2) permits actions only against the "Administrator," not a state.  See Ringbolt Farms Homeowners Ass'n v. Town of Hull, 714 F. Supp. 1246, 1254–55 (D. Mass. 1989) ("[N]either § 1365(a)(1) nor (a)(2) was intended to allow for a cause of action against a state regulatory agency for failure to enforce the provisions of the [Act].");  cf. Askins v. Ohio Dep't of Agric., 809 F.3d 868, 875–76 (6th Cir. 2016) (holding that Act does not permit citizen suits against states in their regulatory capacity).

ministerial acts" with "judgmental decisions"). Courts look for mandatory language such as "must," "will," or "shall." Cf. Maine v. Thomas, 874 F.2d 883, 889, 891 & n.9 (1st Cir. 1989) (characterizing those terms as mandatory). But it is the responsibility of the citizens bringing the action to "identify the provision of the Act which requires such act or creates such duty" and "describe with reasonable specificity the action taken or not taken by the Administrator which is alleged to constitute a failure to perform such act or duty." See 40 C.F.R. § 135.3(b) (specifying contents of notice to Administrator); § 1365(b)(2) (requiring notice before commencing citizen suit).

The plaintiffs assert that the Act imposes the following nondiscretionary duties on the Administrator: (1) to "diligently review" the planning of secondary treatment facilities; (2) to "diligently oversee" the State's administration of the Act; and (3) to "diligently enforce" the consent decree, NPDES permits, and the Act generally. See Doc. No. 39 at 13-14. In support of these claimed duties, the plaintiffs cite two provisions of the Act in their complaint, several more in their brief, and a final provision at oral argument. None of these citations are sufficiently developed to support a claim that the Administrator failed to perform a nondiscretionary duty under the Act.

The inadequacy of the complaint is clear from even a drive-by view of the provisions it cites. For example, the plaintiffs

construe § 1342(a) as requiring the Administrator to issue NPDES permits in a timely manner.  But they neither cite language imposing that mandatory duty, nor even allege that that the Administrator has breached it.  See § 1342(a)(1) ("[T]he Administrator may . . . issue a permit . . . .").  Plaintiffs next construe § 1313(c)-(d) as requiring the Administrator to "diligently oversee the [State's] administration of the [Act]."  Doc. No. 39 at 13.  But subsections (c) and (d) contain roughly 1,400 words, and the plaintiffs do not even attempt to tie their sweeping construction to any statutory language.  They respond to the United States' exegetical briefing on the matter with silence.  See Doc. Nos. 44-1 at 13-14; 45 (failing to discuss § 1313).

For the first time in objecting to the defendants' motions to dismiss, the plaintiffs cite additional Act provisions.  They assert that the Administrator flouted a nondiscretionary duty under § 1283(a) to review plans for the Peirce Island facility.  But the plaintiffs contradict that factual assertion by acknowledging that the EPA did indeed review plans for the plant.  See Doc. No. 39 at 15-18; 45 at 8 n.14, 13-14.  Moreover, § 1283(a) does not set forth any level of substantive analysis, which would in any case involve a discretionary function.  Instead, § 1283(a) requires only that the EPA "act upon" plans that have been submitted "as soon as practicable."

But the plaintiffs brought this citizen suit precisely because they did not like the action taken.  <u>See, e.g.</u>, Doc. No. 39 at 21; Hearing Tr. at 54.  Although the plaintiffs are surely dissatisfied with the thoroughness of EPA's review of the plans for the Peirce Island facility, and they may object to the use of federal funds to construct it, they have not adequately alleged that the EPA failed to timely "act upon" plans submitted to it.

Next, to the extent the plaintiffs argue that a mandatory duty arises under § 1381 from the "[g]eneral authority" of the Administrator to make grants to "accomplish the objectives, goals, and policies of [the Act]," that provision does not establish a mandatory duty that the Administrator has failed to perform here.  Determining which projects will accomplish the purpose of the Act is a paradigmatically discretionary decision. Moreover, the federal funds are generally allocated to the states indirectly via a revolving fund.

Lastly, the plaintiffs sporadically cite a number of other Act provisions, but do not adequately identify how those provisions create a mandatory duty that the Administrator has failed to perform.  <u>See</u> Doc. No. 45 at 6-8; <u>see also</u> §§ 1284(d) (articulating relationship between engineer and grant recipient); 1382(b)(6) (setting out, e.g., labor standards for eligible projects); 1281(g)(1) ("The Administrator is authorized

to make grants . . . . only for projects for secondary treatment
. . . ."); 1311(b)(1)(B) (governing facilities approved or in
existence in 1970s and providing for achievement of effluent
limitations generally, as established by § 1314(d)(1) (requiring
Administrator to publish information on effluent reduction
through secondary treatment)); 1342(q)(1) (requiring decrees,
orders, and permits to conform to CSO policy); cf. Doc. No. 39
at 15 (complaint) (acknowledging that consent decree conforms to
CSO control policy); EA Doc. No. 8 at 9–11, 39–53 (consent
decree) (requiring City to conform to CSO control policy).

Because the plaintiffs have not adequately identified a
nondiscretionary duty imposed by the Act on the Administrator
that the Administrator has failed to perform, I conclude that
they may not commence a citizen suit under § 1365(a)(2).[7]

## IV.   CONCLUSION

For the reasons stated in this Memorandum and Order, I
grant the defendants' motions to dismiss (Doc. Nos. 40, 42, 44).

---

[7] The plaintiffs are also barred from commencing a citizen suit
under § 1365(a)(2) because they have not satisfied the notice
requirement. See § 1365(b)(2) (requiring citizens to give
sixty-day notice before commencing action); 40 C.F.R. 135.3(b)
(specifying substantive content of required notice to
Administrator); see also Doc. No. 42-2 (plaintiffs' notice);
Doc. No. 39 at 9 (acknowledging date of notice). Nearly all of
the provisions cited by the plaintiffs do not appear in the
notice or the complaint.

The clerk is directed to enter judgment accordingly and close the case.

     SO ORDERED.

                                      /s/Paul Barbadoro
                                      Paul Barbadoro
                                      United States District Judge

August 22, 2017

Cc:  Arthur B. Cunningham, Esq.
     Perry M. Rosen, Esq.
     Kelvin A. Brooks, Esq.
     Bruce W. Felmly, Esq.
     Henry Klementowicz, Esq.
     Michael J. Quinn, Esq.
     Suzanne M. Woodland, Esq.